# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

DONNA BURRELL,                               :

     Plaintiff,                         :
                               Case No. 3:12cv00304

  vs.                                     :

                               District Judge Walter Herbert Rice
CAROLYN COLVIN,                              :   Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,                     :

     Defendant.                        :

# REPORT AND RECOMMENDATIONS[1]

## I.    <u>Introduction</u>

Plaintiff Donna Burrell has had partial success in establishing her eligibility for Disability Insurance Benefits and Supplemental Security Income. The Social Security Administration, through Administrative Law Judge Amelia G. Lombardo, concluded that Burrell was under a benefits-qualifying disability beginning on April 15, 2010, but not before.

Burrell brings this present case challenging ALJ Lombardo's decision that she was not under a disability before April 15, 2010. Burrell argues that the overwhelming evidence supports the opinions of her treating physicians and that ALJ Lombardo erred by finding

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

otherwise. The Commissioner contends that the ALJ reasonably weighed the medical-opinion evidence and, as a result, the ALJ's decision must be affirmed.

The case is before the Court upon Burrell's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #10), Burrell's Reply (Doc. #11), the administrative record, and the record as a whole. This Court has jurisdiction to review ALJ Lombardo's decision. *See* 42 U.S.C. §§405(g), 1383(c)(3).

## II.    **"Disability" Defined**

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). A "disability" consists only of physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70.

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### III.     Background

#### A.     Vocational Background and Health Problems

In November 2007, Burrell applied for DIB and SSI asserting that she was under a
disability beginning on November 3, 2007.[2] *Id*., PageID at 198-200, 203-05. She was fifty
years old and thus fell into the category of a person closely approaching advanced age,
according to Social Security regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c).[3] On the date
of ALJ Lombardo's decision, Burrell was still in this age category.

Burrell has an eleventh-grade education, and her jobs over the years have included
fast-food worker, laundry worker, and care giver in a group home.

Burrell's health problems consist of, in part, degenerative disc disease in the cervical
and lumbar regions of her spine, depression, and anxiety.

#### B.     Medical Evidence and Treating Medical Sources

Burrell relies on the opinions provided by her treating physicians Dr. Mote, Dr.
Gargasz, and Dr. Goodson. She also relied on the findings of Dr. Ahmed, a consulting
specialist.

On November 26, 2007, Burrell's treating physician Dr. Mote completed a "Basic
Medical" form used by Ohio Job and Family Services. Dr. Mote listed Burrell's medical

------

[2] Burrell previously filed a DIB application in February 2005, but her application was denied
because she had been engaged in substantial gainful activity. (Doc. #6, PageID at 193; *see* Doc. #8,
PageID at 971).

[3] The remaining citations will identify the pertinent DIB regulations with full knowledge of the
corresponding SSI regulations.

conditions as including low-back pain, neck pain, degenerative disc disease, "somatic dysfunction back," hypertension, rotator-cuff tendonitis. (Doc. #6, PageID at 566). Dr. Mote's identified two findings: "degeneration of L5-S1, disk" and "cervical degeneration at C5-6." *Id*. Dr. Mote treated Burrell's back pain with Elavil, Gabapentin, and Percocet, and she noted that Burrell's back problems started in 2003 "from my record review." *Id*. Dr. Mote identified additional treatments as "osteopathic manipulation and pain management." *Id*.

Dr. Mote opined that during an eight-hour workday, Burrell was limited to one hour of standing/walking, only 10 minutes without interruption; she could sit for 3 hours, only 30 minutes without interruption; she could lift up to five pounds frequently or occasionally; she was markedly limited in her ability to bend and reach; and she was moderately limited in her ability to push/pull, handle, and perform repetitive-foot movements. (Doc. #6, PageID at 567). Dr. Mote provided no response to the form's request for her supporting observations or medical findings. *Id*. Dr. Mote also checked a box indicating that Burrell was unemployable for 12 months or more. *Id*.

On May 8, 2008, a pain-management specialist, Dr. Ahmed, evaluated Burrell for "management of chronic back pain." (Doc. #6, PageID at 729). Dr. Ahmed wrote, in part:

> Back and spine examination shows restriction of flexion and extension, and it seems both extension and flexion are equally restricted and painful. Spine palpation reveals midline and facet tenderness in lumbosacral region. Straight leg raising is negative bilaterally in the sitting position. No other significant findings could be elicited on this exam.

*Id*., PageID at 730. Dr. Ahmed noted a recent lumbar MRI showed disc bulges at L4-5 and

4

L5-S1 with bilateral facet arthropathy in most of her lumbar spine and a cervical spine MRI showed very little degenerative disc disease. His impression was lumbar and cervical degenerative disease, lumbar facet arthropathy, and lumbar disc bulge with radiculopathy.

*Id*., PageID at 731. He reduced Burrell's Percocet and prescribed Amitriptyline for sleeping.

On May 17, 2008, Burrell underwent another lumbar spine MRI, revealing:

L4-5 shows a broad based disc bulge and moderate bilateral facet arthropathy and ligamentum flavum thickening. There is some bilateral neural foraminal narrowing without nerve root compression, left greater than right. No central stenosis is seen.

L5-S1 shows minimal broad based disc bulge and mild bilateral facet arthropathy. There is some bilateral neural foraminal narrowing as well, left greater than right.

*Id.*, PageID at 733. The impression was degenerative disc disease with spondylosis.

In June 2008, Burrell's treating physician, Dr. Gargasz, wrote a short letter stating:

I am writing this letter on behalf of Ms. Burrell, as I feel that it is medically necessary for her [to] receive benefits. I am a Family Practice physician, who has been taking care of Ms. Burrell at Cassano Health Center. Ms. Burrell has a history of depression, high blood pressure, tobacco abuse and hypokalemia. These issues all need close follow up and frequent medical visits, as well as medication....

(Doc. #6, PageID at 661).

On September 22, 2008, Dr. Gargasz completed a Basic Medical form. (Doc. #6, PageID at 751-52). She listed Burrell's medical conditions as insomnia, depression, knee osteoarthritis, hypertension, and low-back pain lumbar degenerative disc disease. When asked about Burrell's history of these health problems, Dr. Gargasz referred to the "office notes." *Id.*, PageID at 751. Dr. Gargasz also checked a box indicating her opinion that

5

Burrell's "Health Status" was "Good Stable With T[reatment]." *Id*. Dr. Gargasz also noted that at her last office visit, Burrell was placed on new medication for insomnia and that Burrell was "undergoing treatment with pain management specialist [and] psychiatry." *Id*.

Dr. Gargasz opined that during an eight-hour workday, Burrell could stand/walk for one to two hours, uninterrupted for one hour; she could sit for one to two hours, uninterrupted for one hour; and she could lift/carry up to five pounds frequently and occasionally. And Dr. Gargasz believed that Burrell was markedly impaired in her ability to push/pull, bend, reach, handle, and perform repetitive foot movements. She was moderately limited in her ability to see, hear, and speak. Dr. Gargasz checked a box indicating that Burrell was unemployable for twelve months or more. *Id*., PageID 752.

X-rays of Burrell's cervical spine, taken on November 13, 2008, showed straightening of her cervical spine that indicated muscle spasms and some minor spurring. The impression was mild degenerative disc disease at C5-6. *Id*., PageID at 732.

On December 13, 2008, Burrell underwent a cervical spine MRI, revealing "multiple level disc disease most pronounced at C5-C6. There is no central cord compression or foraminal impingement demonstrated at any level." *Id*., PageID at 803.

In January 2010, Burrell's treating physician Dr. Goodson completed a Basic Medical form used by Ohio Job & Family Services. (Doc. #6, PageID at 914-15). He identified Burrell's medical conditions as degenerative disc disease, back pain, hydroarthrosis, hypertension, asthma, myositis, back pain, obesity, adenopathy, hydroarthrosis, and depression. Her condition was deteriorating. Dr. Goodson opined that during an eight-hour

6

workday, Burrell could stand/walk for 30 minutes, uninterrupted for 30 minutes; she could sit for one hour, uninterrupted for one hour; and she could frequently and occasionally lift/carry up to five pounds. Dr. Goodson further opined that Burrell was extremely limited in her ability to push/pull; markedly limited in her ability to bend and perform repetitive foot movements; and moderately limited in her ability to reach, handle, and see. Dr. Goodson checked a box indicating that Burrell was unemployable for 12 months or more. (Doc. #6, PageID at 915).

As to Burrell's mental impairments, Dr. Goodson thought that she was markedly limited in her ability to remember locations and work-like procedures; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; set realistic goals or make plans independently of others. *Id.*, PageID at 916. Dr. Goodson expected these restrictions to last 12 months or more.

Burrell's treating psychiatrist Dr. Singh answered interrogatories in October 2009. He noted that Burrell's initial assessment occurred in December 8, 2008 and that she had been

treated for major depression and anxiety. (Doc. #6, PageID at 807-08). Dr. Singh wrote,

"The patient experiences pain due to her medical conditions, which has caused her to be

unable to work. She has been independent most of her life and has raised a large family by

herself. The inability to be self reliant has increased her level of depression. The depression

has, in turn, increased the sensation of pain." *Id*., PageID at 209. Dr. Sing further opined

that Burrell would be unable to be prompt and regular in work attendance. He explained,

"Per patient, her medical condition ... in combination with depression..., creates problems

with her energy level, motivation, and sleep, would make it difficult for her to be 'prompt

and regular in attendance.'" *Id*., PageID at 810. Dr. Singh also concluded that Burrell could

not perform many other mental-work abilities. For example, she could not respond

appropriately to supervision, co-workers, or customary work pressures; sustain attention and

concentration on her work to meet normal standards of work productivity and work

accuracy; demonstrate reliability; maintain concentration and attendance for extended

periods; or complete a normal work day and work week without interruption from

psychologically based symptoms. *Id*., PageID at 810-15.

### C.    <u>Non-Treating Physicians</u>

In January 2008, Dr. Gerald Klyop reviewed the record at the request of the Ohio

Bureau of Disability Determinations. According to Dr. Klyop, Burrell could occasionally

lift/carry up to 50 pounds and frequently lift/carry up to 25 pounds. Dr. Klyop believed that

during an eight-hour workday, Burrell could stand/walk for six hours and sit for six hours

out of eight. Dr. Klyop explained that his conclusion were based on Burrell's

8

> alleged degenerative disc disease, problems with right leg. ER visit 9/07 for
> back pain, back had no signif tenderness, extremities n1, ambulated with
> steady gain, ht 67 in, wt 185 lbs, neck strain with spasm & herniated Cspine
> disc dxd. Cspine xray: mild ddd at C5-6. T/s physical exams show tenderness
> lumbar paraspinals & trapezius, able to squat, reach down to ankles, side bend
> to 30 degrees, DTRs 2+, strength 5/5....

(Doc. #6, PageID at 616)(abbreviations in original). Dr. Klyop further opined that Burrell

was never to climb ladders, ropes, or scaffolds.

In July 2008, Dr. Collins, a nontreating psychologist, reviewed the record and

completed a form assessing Burrell's mental-work abilities and limitations. (Doc. #6,

PageID at 686-704). She recognized that Burrell suffered from depression, and she indicated

that Burrell had mild restriction in her activities of daily living; moderate difficulties in

maintaining social functioning; moderate difficulties in maintaining concentration,

persistence, or pace; and no episodes of decompensation, each of extended duration.  *Id*.,

PageID at 697. Dr. Collins explained, in part, that Burrell had complained only of physical

impairments at the initial and reconsideration stages of the Social Security Administration's

review. She noted that the medical evidence "suggests some depression." *Id*., PageID at 703.

Dr. Collins pointed out that Burrell's employment did not end because of psychological

symptoms; rather it ended due to pain, according to Burrell.  Dr. Collins further wrote:

> Clt would best be suited in work environments not requiring extended contact
> w/ others. Clt capable of understanding and following simple one and two step
> instructions. Clt capable of maintaining attention, concentration, pace, and
> persistence for simple and routine tasks. Clt should avoid work in
> environments with high demands or strict production quotas....

(Doc. #6, PageID at 703).

Dr. Jerry McCloud, a non-treating/non-examining physician, reviewed the record on August 15, 2008 at the request of the Ohio Bureau of Disability Determinations. (Doc. #6, PageID at 735-42). He opined that Burrell could occasionally lift/carry up to 20 pounds and frequently lift/carry up to 10 pounds. He further opined that during an eight-hour workday, Burrell could stand/walk at least two hours and sit for six hours. According Dr. McCloud, Burrell was limited in her ability to push/pull in her upper extremities. Dr. McCloud noted:

> Clmt can stand/walk up to 4 hours in and 8 hour day. 51 y/o clmt with [degenerative disc disease] in lumbar and cervical areas, lumbar facet arthropathy, lumbar disc bulge w/ radiculopathy. Antalgic gait, favoring the R[ight] side more than left. Str[ength] 5/5, but slightly decreased on the right compared to the left. Slight decrease in sensation over the right leg. [Range of motion] shows restriction in back flexion & extension w/ pain. Midline & facet tenderness in [lumbosacral] region. [Straight-leg raising] negative.

(Doc. #6, PageID at 736). Dr. McCloud also concluded that Burrell could frequently climb ramps and stairs but never climb ladders, ropes, and scaffolds; she could never kneel or crawl; she could occasionally stoop and crouch; and she could overhead reach frequently. And Dr. McCloud found that Burrell's statements that her condition was worsening were credible.

## IV.   The ALJ's Decision

ALJ Lombardo resolved Burrell's DIB and SSI applications by using the five-Step sequential evaluation procedure required by Social Security Regulations. *See* Doc. #6, PageID at 79-93; *see also* 20 C.F.R. § 404.1520(a)(4).  Her pertinent findings began at Step 2 where she concluded that Burrell "had the following sever impairments: cervical and lumbar degenerative disc disease; left knee arthroscopic surgery; depression; and anxiety."

(Doc. #6, PageID at 81).

The ALJ concluded at Step 3 that since November 3, 2007 (her claimed disability onset date), Burrell did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments. *Id.*, PageID at 82.

At Step 4, the ALJ concluded that before April 15, 2010, Burrell retained the residual functional capacity[4] "to perform light work with the following additional limitations: alternate sitting and standing positions every 30 minutes; occasional crouching and stooping; no kneeling or crawling; unskilled work; low stress with no assembly-line production quotas and not fast-paced; and minimal contacts with the general public." (Doc. #6, PageID at 84). Under the Regulations, "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. §404.1567(b).

ALJ Lombardo also found at Step 4 that beginning on April 15, 2010, Burrell's work abilities had decreased to the point she could only perform sedentary work (with no additional restrictions). *Id.*, PageID at 90. And the ALJ found that, Burrell had not been able to perform any of her past relevant work since February 3, 2007.

At Step 5 of the sequential evaluation, the ALJ made separate findings concerning the jobs available to Burrell before and after April 15, 2010. The ALJ concluded that considering (in part) her ability to perform a limited range of light-exertional work, she

---

[4] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

could perform a significant number of jobs available in the national economy, including laundry folder and machine tender. *Id.*, PageID at 91. This, in turn, meant that Burrell was not under a disability and not eligible for DIB or SSI before April 15, 2010.

Yet starting on April 15, 2010, Burrell's health and work abilities had deteriorated to the point where, considering (in part) sedentary work abilities, "there are no jobs that exist in significant numbers in the national economy that [Burrell] can perform," according to the ALJ. *Id.*, PageID at 92. This, in turn, meant that Burrell was under a benefits-qualifying disability beginning on April 15, 2010, thus making her eligible to receive DIB and SSI. The ALJ therefore granted Burrell's DIB and SSI applications to the extent she was under a disability beginning on April 15, 2010 and continuing through the date of the ALJ's decision (December 21, 2010). *Id.*, PageID at 92-93.

## V. <u>Discussion</u>

### A. <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th

Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing the ALJ's legal criteria for correctness – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r of Social Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## B. **Burrell's Treating Medical Sources**

### 1.

Burrell contends that ALJ Lombardo erred by rejecting the opinions provided by her treating physicians. She contends that overwhelming evidence supports the opinions of Dr. Mote, Dr. Gargasz, and Dr. Goodson. Burrell maintains that her "treating physicians were certainly entitled to deference over the opinions of the non-examining State-agency reviewers who did not observe Plaintiff, treat Plaintiff, or review the entire record." (Doc.

13

#8, PageID at 987). And Burrell notes that her treating physicians' opinions were supported

by the findings of Dr. Ahmed, a pain management specialist.

Social Security regulations recognize several different categories of medical sources:

treating physicians and psychologists, nontreating yet examining physicians and

psychologists, and nontreating yet record-reviewing physicians and psychologists.

*Gayheart*, 710 F.3d at 375.

> As a general matter, an opinion from a medical source who has
> examined a claimant is given more weight than that from a source who has not
> performed an examination (a 'nonexamining source), and an opinion from a
> medical source who regularly treats the claimant (a "treating source") is
> afforded more weight than that from a source who has examined the claimant
> but does not have an ongoing treatment relationship (a "nontreating source").
> In other words, "[t]he regulations provide progressively more rigorous tests for
> weighing opinions as the ties between the source of the opinion and the
> individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2
> (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1)).

A treating source's opinion may be given controlling weight under the treating-

physician rule only if it is both well supported by medically acceptable data and not

inconsistent with other substantial evidence of record. *Id*. at 376 (citing 20 C.F.R.

§404.1527(c)(2)). "If the Commissioner does not give a treating-source opinion controlling

weight, then the opinion is weighed based on the length, frequency, nature, and extent of the

treatment relationship, as well as the treating source's area of specialty and the degree to

which the opinion is consistent with the record as a whole and is supported by relevant

evidence." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

Unlike treating physicians, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. Other facts 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion." *Id.* (citing 20 C.F.R. §404.1527(c)(6)).

**2.**

The ALJ set forth the correct legal criteria applicable under the treating physician rule, and she correctly recognized that when a the treating physician rule does not apply, the evaluation of the treating physician's opinion must continue to consider additional factors set forth in the Regulations. The ALJ then correctly identified the applicable factors. *See* Doc. #6, PageID at 86; *see also Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 242.

The issue thus becomes whether substantial evidence supports the ALJ's reasons for rejecting Burrell's treating medical sources' opinions. *See Bass v. Comm'r of Social Sec.*, 499 F.3d 506, 509-12 (6th Cir. 2007); *see also* Social Security Ruling 96-2p, 1996 WL 374188 at *3-*4.

The ALJ first observed that "there are no diagnostic tests or affirmative clinical findings that are consistent with the limitations imposed by Drs. Mote, Gargasz, and Goodson." (Doc. #6, PageID at 86). Substantial evidence supports this reason due to the lack of such test results and evidence during the time period before April 15, 2010 (when an MRI supported Burrell's disability claim). For example, a June 2008 MRI of Burrell's cervical

15

spine showed "disc disease most pronounced at C5-6" but no encroachment or impingement

on the nerve roots or the cord at any level. *Id*., PageID at 803. A June 2008 MRI of Burrell's

lumbar spine showed at T12-L1, L1-2, L2-3, and L3-4 "no significant discogenic disease,

central canal or neural foraminal stenosis...." *Id*., PageID at 733. Although this MRI also

showed a broad-based disc bulge at L4-5, there was no central stenosis seen and only

moderate facet arthropathy. *Id*. At L5-S1, the MRI revealed minimal broad-based disc bulge

with mild bilateral facet arthropathy. *Id*.  X-rays of Burrell's cervical spine taken in

November 2008 revealed only mild degenerative disc disease at C5-6. *Id*., PageID at 732.

Thus, although these objective tests revealed that Burrell had some degenerative disc

disease, the ALJ reasonable found that testing did not evince nerve encroachment or other

similar neurological findings. Substantial evidence therefore supports the ALJ's conclusion

that the treating physicians' opinions were not well supported by medically acceptable

clinical and laboratory diagnostic techniques nor consistent with the limitations the treating

source's imposed. *See id*., PageID at 86-87.

     In addition, Dr. Mote's treatment notes mainly show that Burrell reported tenderness

with muscle spasm.  *Id*., PageID at 574, 576, 578-82, 584-87, 590, 597-98, 600-01). The

notes, however, do not specify any functional limitations. To the contrary, notes from

January 2007 and November 2008 indicate that, despite spasm, loss of lumbar lordosis

(straightening of the curve in the low back), and tenderness; Burrell's strength was 5/5 with

normal reflexes; and she could squat, reach to her ankles, and side bend to 30 degrees.  *Id*.,

PageID at 600-01.

Dr. Gargasz's notes also indicate that Burrell experienced tenderness and pain with range of motion, but the evidence does not consistently indicate that the extent of her range of motion is limited, only that it is painful. *See id.*, PageID at 623, 626-27, 629, 631, 634, 636, 640-41). Dr. Gargasz's clinical and diagnostic findings regarding Burrell's knee showed merely mild swelling and mild crepitus, as well as minimal spurring and possible left joint mouse. *Id.*, PageID at 758, 760-61.

Contrary to Burrell's argument, Dr. Ahmed's findings did not support Dr. Gargasz's restrictive opinion. Although Burrell had a painful gait and restricted and painful flexion and extension, her strength was 5/5 in both legs; she had intact sensation (other than "slight" decrease on the right) and normal reflexes; and she had a negative result on a straight-leg-raising test. *Id.*, PageID at 730. Dr. Ahmed's evaluation of Burrell's upper extremities did not reveal any motor, sensory, or reflex deficits. *Id.*, PageID at 730.

Burrell cites to physical therapy notes, but these notes show strength only decreased to 3-4/5 and despite her report of a positive straight-leg test, the note indicates that the test was negative. *Id.*, PageID at 661-62.

The ALJ also correctly observed that Burrell's physicians treated her spinal ailments conservatively with referrals for orthotics, chiropractic services, and steroid injections (which Burrell reported, at times, helped her pain symptoms), and with no recommendations for surgery. *See id.*, PageID at 83, 87, 668, 725, 764, 768, 888. The ALJ also reasonably observed that the office notes of Drs. Mote, Gargasz, and Goodson revealed "no functional limitations whatsoever or any clinical findings in support" of their opinions. *Id.*, PageID at

87.

Burrell also cites no evidence of supporting treatment notes from Dr. Goodson; she merely cites cervical and knee MRI findings. *See* Doc. #8, PageID at 987. However, the cervical MRI showed only moderate changes. *Id.* As to Burrell's knee, the ALJ recognized that it was worsening as she cited the June 2009 MRI of Plaintiff's left knee, along with her August 2009 surgery. (Doc. #6, PageID at 82, 822, 942, 946). Yet Plaintiff received physical therapy after her knee surgery and by October 2009 had met all of her short and long-term goals and had demonstrated "no functional deficits." *Id.*, PageID at 823. Substantial evidence therefore supported the ALJ's finding that the treatment notes of Drs. Mote, Gargasz, and Goodson did not support their opinions.

The ALJ also noted that none of those doctors were orthopedic specialists or neurosurgeons, physicians whose opinions would have been more persuasive. It was not error for the ALJ to consider their lack of specialization as part of her evaluation of these physicians' opinions. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

The ALJ also reasonably accorded "very little, if any weight" to Dr. Klyop's opinion that Burrell could perform medium work because "the evidence as stated elsewhere in this opinion demonstrates that [Plaintiff] is more limited than Dr. Klyop concluded." (Doc. #6, PageID at 87). Namely, Dr. McCloud opined that Burrell could perform work at the light level of exertion with the following limitations: no climbing ladders, ropes, or scaffolds;

18

limited to frequent climbing of ramps and stairs; no kneeling or crawling; occasional stooping and crouching; and limited to frequent overhead reaching. *Id.*, PageID at 736-38. Dr. McCloud supported his opinion with reference to Burrell's degenerative disc disease in her neck and low back; her lumbar facet arthropathy; her lumbar disc bulge with radiculopathy; her antalgic gait, favoring the right side more than the left; her normal (5/5) strength that was slightly decreased on the right compared to left; her slight decrease in sensation over the right leg; her restricted back flexion and extension with pain; her midline and facet tenderness in her low back, and her negative straight leg raise test. *Id.*, PageID at 736.

Burrell maintains that her treating physicians were "certainly entitled to deference" over Dr. McCloud. However, an "ALJ's decision to accord greater weight to state agency physicians over [a claimant's] treating sources was not, by itself, reversible error." *Blakely v. Comm'r of Social Sec.*, 581 F. 3d 399, 409 (6th Cir. 2009). Thus, there is no basis to simply reject the state agency doctor's opinion only because it contradicts a treating physician's opinion. Here, the ALJ reasonably gave more weight to Dr. McCloud's opinion because Burrell had not presented substantial evidence that demonstrated her inability to perform light work in accordance with the ALJ's residual functional capacity finding.

Turning lastly to Burrell's mental residual functional capacity, the ALJ reasonably declined to place controlling or even deferential weight on the opinions of Drs. Singh and Goodson. The ALJ reasonably did not accord Dr. Singh's opinion significant weight because Dr. Singh frequently noted that his opinion was based on Burrell's reports. *See* Doc. #6,

PageID at 87, at 810-20); *see McCoy ex rel. McCoy*, 81 F.3d at 47 (An ALJ may discount a

treating physician's opinion if it is solely based on a claimant's subjective complaints.). The

ALJ further discounted Dr. Singh's opinion because it was "completely inconsistent with

treatment notes from his facility, which indicate [Burrell] to be stable, improving, with no

thoughts of suicide and normal mental status examination." *See id.*, PageID at 87, 832-54.

This was an appropriate ground for discounting Dr. Singh's opinions. *See* 20 C.F.R. §

404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the

more weight we will give that opinion."); *cf. Mullen v. Bowen*, 800 F.2d 535, 552 (6th Cir.

1986) (en banc) ("[T]he Appeals Council explained why it relied on only the unfavorable

part of the psychiatric evaluation by stating that the psychiatric evaluation was internally

inconsistent."). Because Dr. Singh's opinion lacked support and was inconsistent with other

substantial evidence in the record, the ALJ reasonably did not give it controlling or

significant weight.

The ALJ properly gave Dr. Goodson's opinion very little weight because it, like Dr.

Singh's opinion, was inconsistent with treatment notes from Burrell's mental health treating

sources. *See* Doc. #6, PageID at 88, 832-54.  The ALJ also noted that Dr. Goodson was not a

psychiatrist or licensed psychologist, which was a proper factor to consider under the

Regulations.[5] *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the

---

[5] The ALJ mistakenly noted that Dr. Goodson was not considered an acceptable medical
source to evaluate the effect of Plaintiff's mental impairments on her ability to perform
work-related functions. (Doc. #6, PageID at 88). The Commissioner correctly points out that the ALJ also
applied the relevant regulatory factors when evaluating Dr. Goodson's opinion as if he was an acceptable
medical source and reasonably found that his opinion deserved little weight.  *See id.* Therefore, the ALJ's

opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Because Dr. Goodson's opinion was inconsistent with other substantial evidence in the record and outside his area of expertise, the ALJ reasonably did not give it controlling or even significant weight.

Accordingly, for all the above reasons, Burrell's Statement of Errors lacks merit.

## IT THEREFORE IS RECOMMENDED THAT:

1.      The Commissioner's final non-disability decision be affirmed; and

2.      The case be terminated on the docket of this Court.


July 24, 2013                                    _____s/ Sharon L. Ovington_____
                                                        Sharon L. Ovington
                                                Chief United States Magistrate Judge

---

mistaken belief that the Dr. Goodson was not an acceptable medical source was harmless.

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).